STATE OF NORTH CAROLINA
v.
BOBBY E. BOWDEN

No. COA12-1072

Filed 20 August 2013

**Sentencing—sentence reduction credits—unconditional release date**

The trial court correctly concluded that a defendant whose death sentence was converted to life in 1976 had a constitutionally protected liberty interest in good time, gain time, and merit time sentence reduction credits which he earned between 1975 and October 2009 and that defendant was entitled to have those sentence reduction credits deducted from his sentence for all purposes, including the calculation of his unconditional release date. This case is distinguished from *Jones v. Keller*, 364 N.C. 249, by the actual award and application of sentence reduction credits by the Department of Correction to reduce defendant's unconditional release date.

Judge McCULLOUGH concurring with separate opinion.

Appeal by the State from order entered 8 May 2012 by Judge Gregory A. Weeks in Cumberland County Superior Court. Heard in the Court of Appeals 13 March 2013.

*Attorney General Roy Cooper, by Special Deputy Attorney General Joseph Finarelli, for the State.*

*Appellate Defender Staples Hughes, by Assistant Appellate Defender Katherine Jane Allen, for defendant-appellee.*

BRYANT, Judge.

Where there was competent record evidence to support the trial court's findings of fact, where those findings of fact supported the trial court's conclusions of law, and where the trial court properly distinguished defendant's case from the holding in *Jones v. Keller*, 364 N.C. 249, 698 S.E.2d 49 (2010), we affirm the 8 May 2012 order of the trial court.

## Facts and Procedural History

On 15 December 1975, defendant Bobby Bowden was convicted of two counts of first-degree murder and one count of armed robbery and was sentenced to death for the homicide of two individuals on 7 August 1975. On appeal in 1976, the Supreme Court of North Carolina vacated defendant's death sentence and remanded the case with directives that judgments imposing life sentences be imposed for the two counts of first-degree murder. *State v. Bowden*, 290 N.C. 702, 228 S.E.2d 414 (1976) (*"Bowden I"*). Defendant was given two life sentences, to run concurrently.

In December 2005, defendant filed a Petition for Writ of *Habeas Corpus ad Subjiciendum*. Defendant claimed that he was entitled to be released from prison because after applying all of his sentence reduction credits, he had completed service of his 80-year life sentence. At the time defendant committed his offenses, N.C. Gen. Stat. § 14-2 (1974) provided that a life sentence should be considered as imprisonment for 80 years. The trial court denied defendant's petition by order entered on 25 January 2006.

Defendant filed a petition for writ of certiorari on 29 January 2007 to our Court. On 12 February 2007, our Court treated defendant's petition as a motion for appropriate relief, vacated the 25 January 2006 order, and remanded the matter for an evidentiary hearing pursuant to N.C. Gen. Stat. § 15A-1420. Following an evidentiary hearing on defendant's motion for appropriate relief held on 27 August 2007, the trial court entered an order denying defendant's claim for relief.

Defendant appealed the denial of his motion for appropriate relief to our Court. In *State v. Bowden*, 193 N.C. App. 597, 668 S.E.2d 107 (2008)

(*"Bowden II"*), our Court noted that at the time defendant committed his offenses, section 14-2 of the North Carolina General Statutes provided that

> [e]very person who shall be convicted of any felony for which no specific punishment is prescribed by statute shall be punished by fine, by imprisonment for a term not exceeding 10 years, or by both, in the discretion of the court. *A sentence of life imprisonment shall be considered as a sentence of imprisonment for a term of 80 years in the State's prison.*

*Id.* at 599, 668 S.E.2d at 109 (citation omitted). The *Bowden II* Court held that N.C. Gen. Stat. § 14-2 (1974) treats defendant's life sentence as an 80-year sentence for all purposes — without any limitation or restriction. *Id.* at 600-601, 668 S.E.2d at 109-10. Our Court also noted that "for reasons unclear to this Court, the [DOC] later retroactively changed the status of defendant's sentence reduction credits from 'applied' to 'pending.' " *Id.* at 598, 668 S.E.2d at 108. Our Court reversed the trial court's order and remanded for a "hearing to determine how many sentence reduction credits defendant is eligible to receive and how those credits are to be applied." *Id.* at 601, 668 S.E.2d at 110.

The State sought discretionary review of *Bowden II*, which was initially granted by the Supreme Court. *State v. Bowden*, 363 N.C. 258, 677 S.E.2d 161 (2009). On 9 October 2009, the Supreme Court entered an order that discretionary review had been improvidently allowed. *State v. Bowden*, 363 N.C. 621, 683 S.E.2d 208 (2009).

On remand, the trial court held a hearing on 15-16 March 2012 and entered a Memorandum Opinion and Order on 8 May 2012. The 8 May 2012 Memorandum Opinion and Order of the trial court concluded that defendant had a liberty interest in good time, gain time, and merit time sentence reduction credits which he earned between 1975 and October 2009. It also concluded that those sentence reduction credits were subject to constitutional protection under the Due Process Clause of the United States Constitution. Further, the trial court determined that defendant was entitled to have those sentence reduction credits deducted from his sentence for all purposes, including the calculation of his unconditional release date. The trial court concluded that the Department of Correction's ("DOC") revocation of defendant's sentence reduction credits violated his rights under the Due Process Clause and violated the Ex Post Facto Clause of the United States Constitution. The trial court then determined that defendant had served the entirety of his sentence, that his unconditional release date was 13 October 2009, and

that he would be released on 29 October 2009 (the date the mandate issued in his case). The trial court ordered that defendant be released unconditionally by 11 May 2012, no later than 5:00 p.m.

However, on 9 May 2012, the trial court entered an order granting the State's motion to stay the 8 May 2012 order until final appellate review.

On 30 May 2012, the State sought review of the trial court's 8 May 2012 order by filing a Petition for Writ of Certiorari which was entered 18 June 2012. It was granted by our Court by order entered 18 June 2012. Thereafter, both parties submitted a record and briefs to our Court.

---

The State advances the following issues: whether the trial court erred by (I) distinguishing defendant's case from *Jones v. Keller*, 364 N.C. 249, 698 S.E.2d 49 (2010); (II) entering findings of fact not supported by competent evidence; and (III) entering conclusions of law not supported by the findings of fact.

### Standard of Review

When a trial court's findings on a motion for appropriate relief are reviewed, these findings are binding if they are supported by competent evidence and may be disturbed only upon a showing of manifest abuse of discretion. However, the trial court's conclusions are fully reviewable on appeal.

*State v. Heavner,* __ N.C. App. __, __, 741 S.E.2d 897, 903 (2013) (citation omitted).

### I

The State argues that the trial court erred by concluding that defendant's case is distinguishable from the Supreme Court's holding in *Jones v. Keller*, 364 N.C. 249, 698 S.E.2d 49 (2010), based on findings not supported by competent evidence. We disagree.

Here, the trial court concluded that the outcome of the case was not controlled by the *Jones* decision:

11. The outcome of [defendant's] case is not controlled by [*Jones*] because *Jones* is predicated upon the following facts, which are not present in this case: (1) the [DOC] never applied Mr. Jones' good, gain, and merit time sentence reduction credits to reduce his unconditional release date; (2) Mr. Jones was never informed he

would be released on October 29, 2009; (3) Mr. Jones was informed it was only a possibility that he might be released on October 29, 2009; (4) the [DOC] only applied Mr. Jones' good, gain, and merit time sentence reduction credits to reduce his parole eligibility date, to determine his custody classification, and to reduce his sentence in the event the governor commuted his sentence to a term of years; and (5) the [DOC] only performed test runs to calculate Mr. Jones' unconditional release date.

12. In *Jones* the Supreme Court held the trial court found as fact that the [DOC] never used good time, gain time or merit time credits in the calculation of Mr. Jones' unconditional release dates. *Id.* at 254, 698 S.E.2d at 54. The State could lawfully continue to imprison Mr. Jones without applying his sentence-reduction credits to reduce his unconditional release date, because the [DOC] had never used sentence reduction credits to reduce Mr. Jones' unconditional release date. *Id.*, [sic] at 254-55, 698 S.E.2d at 54. Although the Court acknowledged that the [DOC]'s practice in that regard was based on a legal error, *Id.*, [sic] at 252, 698 S.E.2d at 53, the Supreme Court nevertheless "defe[rred]" to the [DOC]'s position in *Jones* that, under its regulations, Mr. Jones was entitled to application of his sentence-reduction credits only to determine parole eligibility and custody grade, not to reduce his sentence. *Id.*, [sic] at 255, 698 S.E.2d at 54.

13. In contrast, the evidence in [defendant's] case shows: (1) the [DOC] applied [defendant's] good, gain, and merit time sentence reduction credits to reduce his unconditional release date; (2) the Combined Records Division of the [DOC] performed production runs to calculate [defendant's] unconditional release date; (3) after applying all good, gain, and merit time sentence reduction credits to reduce [defendant's] unconditional release date, the [DOC] determined that [defendant's] sentence expired on October 13, 2009; (4) [defendant] was informed he would be released on October 29, 2009, pursuant to the decision in his case; and (5) [defendant] was prepared for release on October 29, 2009.

The State argues that conclusion of law number 13 was made in error where there was no competent record evidence to support the

conclusion that the DOC applied defendant's sentence reduction credits to reduce his unconditional release date and to support the conclusion that the Combined Records Division of the DOC had performed production runs to calculate defendant's unconditional release date.

A thorough review of the record indicates that the trial court correctly concluded that the circumstances surrounding defendant's case was distinguishable from *Jones*. We will address each of the trial court's conclusions in turn.

First, the trial court in conclusion number 13 stated that the "DOC applied Mr. Bowden's good, gain, and merit time sentence reduction credits to reduce his unconditional release date." The evidence indicates that after *Bowden II* which established that defendant was serving a term of years sentence, the DOC applied defendant's good, gain, and merit time sentence reduction credits in order calculate an unconditional release date. This is supported by an e-mail sent on 9 October 2009 by DOC's Public Affairs Director Keith Acree to Secretary of Correction Alvin W. Keller, Jr. This e-mail stated that the North Carolina Supreme Court had declined to review *Bowden II* and that the decision of the Court of Appeals would stand. Attached to this e-mail was a list of "affected inmates," including defendant, and included a re-calculated, projected release date of 13 October 2009 for defendant. In addition, on 15 October 2009 Deputy Secretary James French wrote an e-mail to the Director of the Division of Prisons Robert "Bob" Lewis and the Chief Auxiliary Officer Mary Lu Rogers stating that as a result of *Bowden II*,

> [l]ife sentences for a crime committed between April 4, 1974 and June 30, 1978 equal 80 years and that based on other sentencing laws the 80 year sentence is cut to 40 years. In addition the inmate is entitled to other sentence reduction credits earned for program or work participation while in prison. As a result of this ruling the [DOC] is mandated to calculate the affected inmates['] sentence in this manner.

The trial court found that Bob Lewis sent an e-mail on 16 October 2009 addressed to all wardens, administrators, and superintendents providing that the Supreme Court's ruling in *Bowden II* had "caus[ed] the [DOC] to re-calculate the release dates of some life sentence inmates. A number of those inmates will be released later this month and others will be released in the coming months and years as their new release dates are reached."

In the second portion of conclusion number 13, the trial court con-cluded that "the Combined Records Division of the [DOC] performed production runs to calculate Mr. Bowden's unconditional release date."[1] This conclusion was supported by evidence of the DOC's e-mails exchanged between 9 October and 21 October 2009 – all of which sup-ported the unchallenged findings of fact made by the trial court. On 9 October 2009, DOC Public Affairs Director Keith Acree sent an e-mail to Secretary Keller, Deputy Secretary James French, and others containing an attachment of a list created by the Management Information Services and Combined Records Division of the DOC. The attachment listed defendant's projected release date as 13 October 2009. On 13 October 2009, administrative officer Shelby Howerton of the Combined Records Division sent an e-mail with the subject line "Re-audit of inmates sched-uled for release" to the following recipients: Deputy Secretary James French, DOC General Counsel LaVee Hamer, Chief Auxiliary Officer Mary Lu Rogers, Application Development Manager Donna Powell, DOC attorney Elizabeth Parsons, and Combined Records Manager Judy Sills. The e-mail requested "specific instructions on the exact dates you would like the offenders to show in the OPUS [(The Offender Unified Population System is an electronic database used to maintain inmate records)] system prior to getting them ready for their release."

On 14 October 2009, DOC employee Langley Rooney sent an e-mail to Applications Development Manager Donna Powell, stating that "[t]he order has come down to putting these inmates that have a projected release date in the past (or before 10/29/2009), out on 10/29/2009." The e-mail went on to further explain that Rooney had been working with Howerton in the Combined Records Office to fix "the 6 in production that were missing offense dates." On 21 October 2009, Chief Operating Officer Jennie Lancaster sent an e-mail to Chief Information Officer Robert Brinson of the Management Information Services and to oth-ers. The e-mail instructed Brinson to "look at all earned time-good time for each inmate . . [.] and make sure what they received was applicable to the policies/practices in approved status at that time . . . we went through some old documents yesterday . . [.] still looking for 1975 guiding gain time policy . . [.]" These e-mail exchanges support the trial court's

---

1. The trial court noted that the DOC "applied Mr. Bowden's sentence reduction credits in production." In unchallenged finding of fact 42, the trial court stated that "the [DOC] determined that Mr. Bowden's sentence expired on October 13, 2009, when the Combined Records Division, working in production, and assisted by the MIS Division, applied all good, gain, and merit time sentence reduction credits to Mr. Bowden's uncondi-tional release date."

**STATE v. BOWDEN**

[229 N.C. App. 95 (2013)]

unchallenged findings of fact and its conclusion that production runs were conducted to calculate defendant's unconditional release date.

Next, the trial court concluded that "after applying all good, gain, and merit time sentence reduction credits to reduce Mr. Bowden's unconditional release date, the [DOC] determined that Mr. Bowden's sentence expired on October 13, 2009." This conclusion is supported by the unchallenged finding of fact that a 9 October 2009 letter from DOC Public Affairs Director Keith Acree to Secretary Keller, Deputy Secretary of Correction French, Deputy Director of Prisons Anderson, and Victim Services Director Dixon stated that defendant showed a projected release date of 13 October 2009.

Lastly, the trial court concluded that defendant was informed he would be released and was prepared to be released on 29 October 2009. This conclusion is supported by the unchallenged finding of fact that defendant testified that he was informed by his case manager at Tillery Correctional Facility, Ralph Hill, that his release date would be 29 October 2009. It is also supported by the unchallenged findings of fact that Superintendent Oliver Washington informed defendant on 13 October 2009 that he would be released on 29 October 2009 and that Superintendent Washington prepared defendant for release pursuant to a memorandum he had received from the Director of the Division of Prisons and other communications from DOC officials.

Based on the foregoing, we hold that the trial court's conclusion of law number 13 was supported by unchallenged findings of fact which were, in turn, supported by competent record evidence. Next, we address how the conclusions made within conclusion of law number 13 relate to our decision in *Jones*.

In *Jones*, the Supreme Court considered a limited group of prisoners, "each of whom committed first-degree murder between 8 April 1974 and 30 June 1978 and were sentenced to life imprisonment[.]" *Jones*, 364 N.C. at 252, 698 S.E.2d at 53. The *Jones* Court recognized that our General Assembly dedicated the responsibility of administration of Jones' sentence to the DOC. *Id.*

> [T]he Secretary of Correction shall have control and custody of all prisoners serving sentence in the State prison system, and such prisoners shall be subject to all the rules and regulations legally adopted for the government thereof. Specifically, [t]he rules and regulations for the government of the State prison system may contain provisions relating to grades of prisoners, rewards and

STATE v. BOWDEN

[229 N.C. App. 95 (2013)]

> privileges applicable to the several classifications of pris-
> oners as an inducement to good conduct, allowances of
> time for good behavior, the amount of cash, clothing, etc.,
> to be awarded prisoners after their discharge or parole.

*Id.* at 252-53, 698 S.E.2d at 53 (citations and quotations omitted).

The *Jones* Court further noted that DOC had *never* used sentence. reduction credits, which included good time, gain time, or merit time, "in the calculation of unconditional release dates for inmates who received sentences of life imprisonment." *Id.* at 254, 698 S.E.2d at 54. "More specifically, [the] DOC acknowledge[d] that Jones earned gain and merit time, but state[d] that these credits were not applied to reduce the time to be served on his sentence in any way." *Id.* Per the DOC, the "gain and merit time were only recorded in case Jones's sentence was commuted by a governor, at which time they would be applied to calculate a release date" and good time was awarded "solely for the purposes of allowing [Jones] to move to the least restrictive custody grade and to calculate his parole eligibility date." *Id.* Therefore, the issues before the *Jones* Court were whether the DOC's interpretation and implementation of its regulations – specifically refusing to apply Jones' earned gain time and merit time to reduce the time to be served on Jones' sentence – violated Jones' rights to due process and equal protection, as well as whether Jones had suffered an ex post facto violation. *Id.* at 256, 698 S.E.2d at 55.

The *Jones* Court held that Jones' liberty interest in good time, gain time, and merit time was limited and "[t]hus, his liberty interest, if any, in having these credits used for the purpose of calculating his date of unconditional release is de minimis, particularly when contrasted with the State's compelling interest in keeping inmates incarcerated until they can be released with safety to themselves and to the public." *Id.* at 257, 698 S.E.2d at 56. The Court noted that because Jones was eligible for parole and had received annual parole reviews without having been released by the Parole Commission, he had "received the process that is due him as an inmate eligible for parole, when the State's corresponding interest is assuring that inmates are safely released under supervision." *Id.*

The Supreme Court rejected Jones' argument contending there was a violation of his right to equal protection of the law – "that his equal protection right prohibits the State from treating inmates who committed first-degree murder between 8 April 1974 and 30 June 1978 and were sentenced to life imprisonment under N.C.G.S. § 14-2, [and] who are thus serving determinate sentences, differently from other inmates serving

determinate sentences." *Id.* at 259, 698 S.E.2d at 57. The Supreme Court, based on rational basis scrutiny, held that

> Jones was convicted of a different crime than others serving determinate sentences under statutes other than N.C.G.S. § 14-2, even if the sentences of some of those others are for eighty years or even longer (perhaps due to the imposition of consecutive sentences). The fact that Jones is serving a sentence for first-degree murder reasonably suggests that he presents a greater threat to society than prisoners convicted of other offenses. Thus, DOC has a rational basis for denying petitioner good time, gain time, and merit time for the purposes of unconditional release, even though these same credits have been awarded for that purpose to other prisoners with determinate sentences.

*Id.* at 260, 698 S.E.2d at 58.

Furthermore, the *Jones* Court noted that the ex post facto prohibition applies to "[e]very law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed." *Id.* at 259, 698 S.E.2d at 57 (citation omitted) (emphasis in original). However, Jones did not allege that any legislation or regulation had altered his award of sentence reduction credits, nor that the DOC changed its interpretation or its application of its regulations; therefore, there was no ex post facto violation. Based on the foregoing, the *Jones* Court held that Jones was legally incarcerated and reversed the decision of the superior court, ordering that Jones be released. *Id.* at 260, 689 S.E.2d at 58.

In our present case, the DOC actually awarded and applied defendant's good, gain, and merit time sentence reduction credits which he earned between 1975 and October 2009 to reduce defendant's unconditional release date. This is a significant distinction between the instant case and the *Jones* case. Jones' sentence reduction credits were used to reduce his parole eligibility date, to determine his custody classification, and to reduce his sentence in the event the governor commuted his sentence to a term of years. Defendant's sentence reduction credits on the other hand, were used to calculate his unconditional release date.

Here, defendant was never told that it was merely a possibility he might be released early as was the case in *Jones*. Defendant was actually informed that his sentence had expired and that he would be released on 29 October 2009. Defendant prepared for that release, and the DOC prepared for that release. Given these significant distinctions, we are

unable to hold that the trial court erred by concluding that defendant's case is distinguishable from the Supreme Court's holding in *Jones*. This argument is overruled.

## II

The State challenges several of the trial court's findings of fact.

### Finding of Fact Number 28

Here, the trial court entered an unchallenged finding of fact (finding of fact number 27) which stated that in October 2009, Alvin W. Keller, Jr., was the Secretary of Correction for the DOC, Jennie Lancaster the Chief Operating Officer, LaVee Hamer the General Counsel, James French the Deputy Secretary, Robert "Bob" Lewis the Director of the Division of Prisons, and Mary Lu Rogers the Chief Auxiliary Officer. It is well established that "[a]ny unchallenged findings of fact are deemed to be supported by competent evidence and are binding on appeal." *State v. Osterhoudt*, __ N.C. App. __, __, 731 S.E.2d 454, 458 (2012) (citation and quotation marks omitted).

Finding of fact number 28, provided that:

> 28. Each of those officials [named in finding of fact number 27] within the [DOC] is responsible for and has the authority to carry out the plain language of the Department's rules, regulations, policies, procedures and long-standing practices. Each of those officials within the [DOC] is responsible for and has the authority to advise and instruct subordinates throughout the Department on how to carry out the plain language of the Department's rules, regulations, policies, procedures and long-standing practices.

The State argues that the trial court erred by entering finding of fact number 28 where there was no evidence in the record to support this finding. We disagree.

A thorough review of the record reveals that in an administrative memorandum dated 17 November 2009, Keller, serving as Secretary of the DOC, stated the following:

> Since at least 1955, the Secretary of Correction has possessed statutory authority to establish rules and regulations or policies governing the state prison system. More specifically, the Secretary has possessed authority to establish rules and regulations or policies as to grades

of prisoners, rewards and privileges applicable to the classification of prisoners, and allowances of time for good behavior.

On 13 October 2009, Chief Auxiliary Officer Mary Lu Rogers sent an e-mail titled "URGENT Request Regarding Upcoming Inmate Releases" to superintendents of various prisons directing the recipients to call her office immediately. The e-mail further stated that "we have a total of 21 inmates at your locations who must be released this year – 20 this month" and directed the recipients of the e-mail "to move quickly to ascertain release plans and prepare for these releases."

On 14 October 2009, Deputy Secretary James French sent an e-mail instructing the superintendents "at the locations where we have lifers being released" to ask "their programs people [to] share" with the inmates being released information regarding Offender Employment and Training Initiatives.

On 15 October 2009, French sent an e-mail to Director of the Division of Prisons Bob Lewis and Mary Lu Rogers. The e-mail informed Lewis and Rogers that the *Bowden II* decision meant that "life sentences for a crime committed between April 4, 1974 and June 30, 1978 equal 80 years and that based on other sentencing laws the 80 year sentence is cut to 40 years" and that "[i]n addition the inmate is entitled to other sentence reduction credits earned for program or work participation while in prison." French also directed Rogers to give instructions based on this information to his field staff in order to respond to questions from inmates regarding their eligibility for release.

On 16 October 2009, Lewis sent a letter to "Wardens, Administrators, [and] Superintendents," also including Keller, Chief Operating Officer Jennie Lancaster, and French in the correspondence. The letter's subject referred to the *Bowden II* holding and stated the following, in pertinent part:

> [*Bowden II*'s ruling] only affects certain inmates based on the date of their offense(s). The following is provided to assist you in responding to inquiries from the inmate population, their families, and other interested parties. Please share this information with staff likely to be asked questions regarding an inmate's release date.

Lewis' letter went on to reiterate that the DOC was mandated to calculate the affected inmates' sentences in a manner consistent with the *Bowden II* holding and directed the recipients of the letter to relate the

ruling to inmates and other interested parties. The record also indicates that on 16 October 2009, Rogers sent an e-mail to French and Lewis, pursuant to the *Bowden II* ruling, stating that they should "contact the affected agencies to make them aware of the impending release of these inmates who have been confined for many years and are in need of assistance."

On 19 October 2009, Lancaster sent an e-mail to recipients that included Keller, French, and General Counsel LaVee Hamer with the subject headline "Meeting on [W]ednesday for inmate releases." Through her e-mail, Lancaster scheduled a meeting "to review with each other the planning in place for the inmate releases on 10/29/09."

Based on the foregoing, there was competent evidence found within internal correspondence between DOC officials that the officials named in finding of fact 27 were responsible for and had the authority "to advise and instruct subordinates" throughout the DOC on how to carry out the DOC's rules, regulations, policies, procedures, and practices. Furthermore, an unchallenged finding of fact, which is binding on appeal, indicates that

> [a]fter the North Carolina Supreme Court allowed the Court of Appeals' decision to stand in Mr. Bowden's case, [DOC] officials, with the authority to apply and carry out the [DOC's] rules, regulations, policies, procedures, and longstanding practices, authorized [DOC] subordinates throughout the state to begin preparing Mr. Bowden, and the other affected inmates, for release on October 29, 2009.

*See Osterhoudt,* __ N.C. App. at __, 731 S.E.2d at 458 (stating that unchallenged findings of fact are binding on appeal). The State's argument as to finding of fact number 28 is overruled.

*Findings of Fact Number 64, 65, and 70*

Next, the State argues that there was no evidence to support findings of fact numbers 64, 65, and 70 which provided the following:

> 64. The [DOC's] records identify all of Mr. Bowden's good conduct time, merit time, and gain time credits, which he earned and which the [DOC] awarded him between 1973 and 2002, as being applied to his sentence.

> 65. The [DOC] retroactively changed the status of the sentence reduction credits, which Mr. Bowden earned and the [DOC] awarded to him between 1975 and 2002, from "APPLIED" to "PENDING."

. . .

> 70. The [DOC's] August 14, 2007 change in Mr.
> Bowden's sentence reduction credits from "APPLIED"
> to "PENDING" was not the result of a "computer glitch",
> but was a conscious attempt on the part of the [DOC] to
> change Mr. Bowden's records to aid in its litigation against
> Mr. Bowden.

At both of defendant's motion for appropriate relief hearings, the 27 August 2007 hearing and the 15-16 March 2012 hearing before Judge Weeks, evidence was presented showing the DOC's sentence reduction credit records for defendant. The records established defendant's earned good, gain, and merit time from the years 1973 until 2002 and included the "status" of sentence reduction credits as "APPLIED." The DOC also produced, at each separate hearing, a differing version of defendant's sentence reduction credits that listed his 1973 credits' status as "APPLIED" but his 1975 through 2002 credits' status as "PENDING."

During the hearing before Judge Weeks, former Chief Information Officer Robert Brinson testified that he believed the sentence credits reports designated credits as "PENDING" were due to a computer system "glitch." The trial court entered an unchallenged finding of fact that

> 68. Mr. Brinson's explanation is not credible because the
> alteration of Mr. Bowden's sentence reduction credits
> occurred only after he filed his petition for writ of habeas
> corpus and showed he could prove the existence of his
> credits with the "Sentence Reduction Credits" record.

In addition, our Court in *Bowden II* noted that

> [i]nitially, the [DOC's] records indicated that all of defen-
> dant's good conduct time, merit time, and gain time credits
> had been applied to his sentence. However, for reasons
> unclear to this Court, the [DOC] later retroactively changed
> the status of defendant's sentence reduction credits from
> "applied" to "pending."

*Bowden II*, 193 N.C. App. at 598, 668 S.E.2d at 108. There is competent evidence in the record to support the trial court's findings that the sentence reduction credits had been awarded and applied to defendant's sentence, that the status of the sentence reduction credits had been retroactively changed, and that the change was not due to a computer glitch. Therefore, we overrule the State's argument as to findings of fact numbers 64, 65, and 70.

## II

### Conclusion of Law Number 10

The State argues that the trial court erred by entering conclusion of law number 10 and that the trial court's conclusions of law numbers 22 through 25[2], which "flow directly from" conclusion of law number 10, are erroneous as well. We disagree.

Conclusion of law number 10 states the following:

> 10. Between October 9 and October 22, 2009, Secretary of Correction Alvin W. Keller, Jr., was informed by various high ranking officials within the [DOC] that: (1) the [DOC] understood Mr. Bowden and the other affected inmates were serving term-of-year sentences; (2) because the inmates were serving term-of-year sentences, the inmates were entitled to have all good, gain, and merit time sentence reduction credits applied to reduce their unconditional release date; (3) the [DOC] was mandated to apply all good, gain, and merit time sentence reduction credits to reduce their unconditional release dates;

---

2. Conclusions of law number 22 through 25 stated the following:

   22. The [DOC] in fact, between October 9 and October 22, 2009: (1) awarded and applied Mr. Bowden's sentence reduction credits – in the form of good time, gain time, and merit time – to reduce his unconditional release date on his sentence of 80 years incarceration; (2) calculated his unconditional release date/projected release date/PRD/max-out date as October 13, 2009; (3) determined he would be released on October 29, 2009 – the date the mandated [sic] issued in his case; (4) informed him that he would be released on October 29, 2009; and (5) readied him for that release. Therefore, Mr. Bowden is entitled under the North Carolina General Statutes, the United States Constitution, the North Carolina Constitution, and the [DOC's] regulations, policy, and procedure to have these good, gain, and merit sentence reduction credits deducted from his sentence for all purposes, including the calculation of his unconditional release date, and to be immediately unconditionally released.

   23. Given the application of the sentence reduction credits that Mr. Bowden earned pursuant to the [DOC's] regulations, policy, and procedure, and the earned prison credit for time he has served on his sentence, Mr. Bowden's unconditional release date for his sentence of 80 years incarceration, imposed pursuant to N.C. Gen. Stat. § 14-2, was October 13, 2009.

   24. Mr. Bowden has served the entirety of the sentence imposed in his case.

   25. Mr. Bowden has carried his burden of proof showing that he is entitled to relief.

(4) the inmates were told of points 1-3; (5) the inmates were told they would be released on October 29, 2009; and (6) the inmates were actually prepared for that release. The circumstances are such that a denial and or correction would naturally be expected if the Secretary of Correction believed those statements and directions to be untrue, inaccurate, or based upon a misunderstanding of the law or of the [DOC's] rules, regulations, policies, procedures, and longstanding practices. The Secretary's silence from October 9 through October 22, 2009, in the face of those statements constitutes an admission by silence.

A review of the record indicates that in coming to this conclusion, the trial court entered several unchallenged findings of fact regarding communications sent to Keller: (1) Finding of fact 35(a)-(b) provides that on 9 October 2009, "four hours after the Supreme Court issued its decision in Mr. Bowden's case, Department of Correction Public Affairs Director Keith Acree sent an e-mail to [the personal e-mail account of Secretary Keller], Deputy Secretary of Correction French, Deputy Director of Prisons Ricky Anderson, and Victim Services Director Sandy Dixon." This e-mail informed Secretary Keller that that North Carolina Supreme Court had "declined to review the [*Bowden II*] case, meaning the decision of the NC Court of Appeals will stand"; (2) Finding of fact 35(d)-(e) provides that on 16 October 2009, the Division of Prisons Director Robert Lewis sent a memorandum to all wardens, administrators, and superintendents, and Secretary Keller was cc-ed on the e-mail. The memorandum stated the following, in pertinent part:

As I'm sure you are aware, the North Carolina Supreme Court recently issued a ruling in the above referenced case causing the [DOC] to re-calculate the release dates of some life sentence inmates. A number of those inmates will be released later this month and others will be released in the coming months and years as their new release dates are reached. . . . The Court of Appeals has ruled that life sentences for crimes committed between April 4, 1974 and June 30, 1978 equals 80 years which is then cut to 40 years based on other sentencing laws. In addition, the inmate is entitled to other sentence reduction credits earned for program or work participation while in prison which further reduces the amount of actual time served. As a result of this ruling, the [DOC] is mandated to calculate the affected inmates' sentences in this manner.

The trial court also found that on 19 October 2009, "Director Lewis' memorandum was sent to all Superintendents, posted on the Director's Memo page via the web, and copied to Secretary of Correction Alvin W. Keller, Jr."; and (3) Finding of fact 39(a) states that on 19 October 2009, "Chief Operating Officer of the [DOC], Jennie Lancaster, sent an e-mail to various Department officials, including Secretary of Correction Alvin W. Keller, Jr."

The State argues that Secretary Keller did not make an admission by silence because the record fails to show that the communications relied on by the trial court were made in the "presence" of Secretary Keller and that there is no evidence that Secretary Keller either received or read these communications. To support its argument, the State relies on our holding in *FCX, Inc. v. Caudill*, 85 N.C. App. 272, 354 S.E.2d 767 (1987), for the contention that "mere possession of a written statement does not manifest an adoption of its contents." *Id.* at 279, 354 S.E.2d at 772.

Our Court in *FCX* noted that

> [a] person may expressly adopt another's statement as his own, or an adoptive admission may be implied from 'other conduct of a party which manifests circumstantially the party's assent to the truth of a statement made by another person. . . . [A]doptive admissions fall generally into two categories – those implied from an affirmative act of a party, and those implied from silence or a failure to respond in circumstances that *call for a response.*

*Id.* at 278, 354 S.E.2d at 772 (emphasis added). In the case before us, Secretary Keller's admission by silence falls into the latter category.

> Regarding admissions by silence, our Supreme Court stated in *State v. Spaulding*, 288 N.C. 397, 219 S.E.2d 178 (1975): "Implied admissions are received with great caution. However, if the statement is made in a person's presence by a person having first hand knowledge under such circumstances that a denial would be naturally expected if the statement were untrue and it is shown that he was in a position to hear and understand what was said and had the opportunity to speak, then his silence or failure to deny renders the statement admissible against him as an implied admission."

*Id.* at 279, 354 S.E.2d 772-73 (citations omitted). The *FCX* Court noted that "[w]hether the statement is oral or written, the critical inquiry is

whether a reasonable person would have denied it under the circumstances." *Id.* at 279, 354 S.E.2d at 773.

In the present case, there were multiple communications sent to Secretary Keller. None of these written statements elicited a response from Secretary Keller. The content of these written statements were of a nature that a "denial would be naturally expected" if Secretary Keller disagreed with or believed any of the communications to be inaccurate – a "reasonable person would have denied it under the circumstances." *See id.* As Secretary of Correction, possessing the authority to establish rules, regulations, and policies governing the state prison system, Secretary Keller's unique position made it probable that he would have responded if he disagreed in any way. Thus, we are unable to hold that the trial court erred by entering conclusion of law number 10 and the State's argument is overruled. Based on our foregoing holding, we do not reach the State's arguments concerning conclusions of law 22 through 25.

### Conclusions of Law 18 and 21

Next, the State argues the trial court erred by concluding that the DOC violated the Ex Post Facto Clause of the United States. The State contends that because the DOC never applied defendant's sentence reduction credits towards the calculation of his unconditional release date, those credits were not subsequently revoked such that defendant was subject to an *ex post facto* law. We disagree.

The challenged conclusions of law numbers 18 and 21 state the following:

> 18. The [DOC's] revocation of Mr. Bowden's sentence reduction credits – from applying all sentence reduction credits to reduce Mr. Bowden's unconditional release date, to not applying those sentence reduction credits to his unconditional release date – violated the Ex Post Facto Clause of the United States Constitution, *see,* *Lynce v. Mathis,* 519 U.S. 433, 445-447, 137 L.Ed.2d 63, 74-76 (1997); *Weaver v. Graham,* 450 U.S. 24, 33-36, 67 L.Ed.2d 17, 25-27 (1981), and Article I, § 19 of the North Carolina Constitution.
>
> . . .
>
> 21. The [DOC's] August 14, 2007, "retroactive[] change[] in the status of defendant's sentence reduction credits from 'applied' to 'pending' ", *Bowden* 193 N.C. App. at 598, 668 S.E.2d at 108, violated the Ex Post Facto Clause

of the United States Constitution, *see Lynce*, 519 U.S. at 445-447, 137 L.Ed.2d at 74-76; *Weaver*, 450 U.S. at 33-36, 67 L.Ed.2d at 25-27, and Article I, § 19 of the North Carolina Constitution.

As we have previously discussed, we held that there was competent evidence to support the trial court's finding that the DOC applied sentence reduction credits to defendant's unconditional release date.

> The *ex post facto* prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed. Through this prohibition, the Framers [of the Constitution] sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed.

*Weaver v. Graham*, 450 U.S. 24, 28-29, 101 S. Ct. 960, 964 (1981) (citations omitted). "To fall within the *ex post facto* prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'—and it 'must disadvantage the offender affected by it[.]' " *Lynce*, 519 U.S. at 441, 117 S. Ct. at 896 (citation omitted).

We hold that the present case fulfills both requirements. The DOC's revocation of defendant's sentence reduction credits after it applied his sentence reduction credits to calculate his unconditional release date was retrospective and disadvantaged defendant by "lengthen[ing] the period that someone in [defendant's] position must spend in prison." *Id.* at 442, 117 S. Ct. at 896 (citation omitted). These factors amounted to a violation of the Ex Post Facto Clause of the United States Constitution. *See id.* at 446, 117 S. Ct. at 898 (stating that because petitioner was awarded 1,860 provisional credits which were retroactively canceled as a result of a 1992 amendment, the 1992 amendment "has unquestionably disadvantaged petitioner because it resulted in his rearrest and prolonged his imprisonment" and amounted to an ex post facto clause violation). Therefore, this argument is overruled.

### Conclusions of Law 14 through 16 and 19 through 20

The State argues that through conclusions of law 14, 15, 16, 19, and 20, the trial court erroneously concluded that the DOC created a "legitimate expectation of release," created a liberty interest in those credits, and violated defendant's due process rights by "revoking" them when

the DOC never applied sentence reduction credits to defendant's unconditional release date. We disagree.

The challenged conclusions of law state the following:

> 14. When the [DOC] in early October 2009, awarded and applied Mr. Bowden's good, gain, and merit time sentence reduction credits, which he earned between 1975 and October 2009, to reduce his unconditional release date on his sentence of 80-years incarceration, in accordance with [DOC] regulations, policies, procedures, and longstanding practices, a "liberty interest" in those credits was created that is subject to constitutional protection under the due process clause of the United States Constitution. *See Wolff v. McDonald*, 418 U.S. 539, 558, 41 L.Ed.2d 935, 952 (1974).

> 15. When the [DOC] informed Mr. Bowden in early October 2009 that, pursuant to the Supreme Court's decision in his case, his sentence had expired and he would be released on October 29, 2009, and when the [DOC] began readying him for that release in accordance with the [DOC's] rules, regulations, policies, procedures, and longstanding practices, it "create[d] a legitimate expectation of release" which gave rise to a liberty interest subject to constitutional protection under the due process clause of the United States Constitution. *See Board of Pardons v. Allen*, 482 U.S. 369, 371-74, 96 L.Ed.2d 303, 308-310 (1987); *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 12, 60 L.Ed.2d 668, 678 (1979).

> 16. The [DOC's] revocation of Mr. Bowden's sentence reduction credits, in which he has a protected liberty interest, violated Mr. Bowden's rights under the due process clause of the United States Constitution. *See Wolff*, 418 U.S. 539 at 557, 41 L.Ed.2d at 952.

> . . .

> 19. Between 1975 and 2002, when the [DOC] awarded Mr. Bowden gain time, merit time and restored good time and identified that time as "APPLIED" in its own "Sentence Reduction Credits" records, in accordance with [DOC] regulations, policies, procedures, and longstanding practices, a "liberty interest" in those credits was created that is subject to constitutional protection under the due process

clause of the United States Constitution. *See Wolff*, 418 U.S. at 558, 41 L.Ed.2d at 952.

20. The [DOC's] August 14, 2007, "retroactive[] change[] in the status of defendant's sentence reduction credits from 'applied' to 'pending' ", *Bowden* 193 N.C. App. at 598, 668 S.E.2d at 108, violated Mr. Bowden's rights under the due process clause of the United States Constitution, *see Wolff*, 418 U.S. 539 at 557, 41 L.Ed.2d at 952, and Article I, § 19 of the North Carolina Constitution.

"The United States Supreme Court has held that [l]iberty interests protected by the Fourteenth Amendment may arise from two sources- the Due Process Clause itself and the laws of the States." *Jones*, 364 N.C. at 256, 698 S.E.2d at 55 (citations and quotations omitted).

The Due Process Clause applies when government action deprives a person of liberty or property; accordingly, when there is a claimed denial of due process we have inquired into the nature of the individual's claimed interest. [To] determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake.

*Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S. Ct. 2100, 2103 (1979) (citations and quotations omitted).

"While a prisoner retains basic constitutional rights, the Supreme Court has found that an inmate's liberty interests derived from the Fourteenth Amendment are limited, given the nature of incarceration[.]" *Jones*, 364 N.C. at 256, 698 S.E.2d at 55 (citations omitted). Even so, it is well established that "a State may create a liberty interest protected by the Due Process Clause through its enactment of certain statutory or regulatory measures. Prisoner benefits in the form of good time, gain time, and merit time arise from such statutes or regulations." *Jones*, 364 N.C. at 256, 698 S.E.2d at 55 (citations omitted).

When a liberty interest is created by a State, it follows that the State can, within reasonable and constitutional lim- its, control the contours of the liberty interest it creates. In other words, the liberty interest created by the State through its regulations may be limited to those particular aspects of an inmate's incarceration that fall within the purview of those regulations.

*Id.* at 256-57, 698 S.E.2d at 55-56.

We note that we have already held above that competent evidence supports the finding that DOC applied defendant's sentence reduction credits to his unconditional release date. When the DOC applied defendant's good, gain, and merit time sentence reduction credits to reduce his unconditional release date, it "interpreted its regulations as permitting the award of different types of time credits for certain purposes, and has in fact, awarded those credits to [defendant] for those purposes." *Id.* at 257, 698 S.E.2d at 56. Because defendant once received the sentence reduction credits towards the calculation of his unconditional release date, a purpose for which he is entitled, the DOC's actions created a liberty interest in those credits subject to protection under the Due Process Clause of the United States Constitution. *See Wolff v. McDonnell,* 418 U.S. 539, 557, 94 S. Ct. 2963, 2975 (1974) (stating that "the State having created the right to good time[,] . . . the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment 'liberty' to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated"). We believe that under the facts of the instant case, this liberty interest, unlike in *Jones,* is not limited in scope, but entitled to full constitutional protection.

Further, the DOC's actions "create[d] a legitimate expectation of release" subject to constitutional protection under the due process clause. *See Greenholtz,* 442 U.S. at 12, 99 S. Ct. at 2106 (stating that the "expectancy of release provided in this statute is entitled to some measure of constitutional protection); *Board of Pardons v. Allen,* 482 U.S. 369, 371-74, 107 S. Ct. 2415, 2417 (1987) (holding that a statute providing that the parole board shall release prisoners on parole when certain prerequisites were fulfilled created a liberty interest protected by the Due Process Clause.) The DOC's subsequent act of revoking defendant's sentence reduction credits violated his due process rights. *See Wolff,* 418 U.S. at 557, 94 S. Ct. at 2975. Therefore, we overrule the State's argument that the trial court's conclusions of law 14 – 16, 19, and 20 were made in error.

Based on the foregoing, we affirm the 8 May 2012 order of the trial court.

Affirmed.

Judge HUNTER, Jr., Robert N., concurs.

McCULLOUGH, Judge, concurring with separate opinion:

I write separately, concurring in the case before this Court, which will now be labeled *Bowden III*. I was the author of *State v. Bowden*, 193 N.C. App. 597, 668 S.E.2d 107 (2008), which was filed on 4 November 2008. That case is referred to as *Bowden II* in the majority opinion. While discretionary review was originally accepted by our Supreme Court, that review was eventually withdrawn as having been improvidently granted by an order entered on 9 October 2009. Within a short period of time thereafter, the mandate of this Court's opinion in *Bowden II* became final. N.C.R. App. P. 32.

Thereafter, the N.C. Department of Correction ("DOC") issued credits to this appellant pursuant to a lawful court order. Under the law of the case doctrine, (*see Creech v. Melnik*, 147 N.C. App. 471, 556 S.E.2d 587 (2001)), even if our Supreme Court should now believe that *Bowden II* was erroneously decided, and that the doctrine set forth in *Jones v. Keller*, 364 N.C. 249, 698 S.E.2d 49 (2010), should have been applied, it would not affect the outcome in the case at bar. Under that doctrine, the holding of that case became the final word on the issues decided in *Bowden II*. This principle is well-established and was explained in *Creech* as follows:

> Preliminarily, we address the issue of whether the earlier decisions in *Creech I* and *II* set forth a doctrine of law that decides the issues in this appeal—whether Mr. Pulley had authority to contract on behalf of the minor, and whether the alleged contract on behalf of the minor required court approval. We conclude that they do not.

>> "As a general rule, when an appellate court passes on questions and remands the case for further proceedings to the trial court, the questions therein actually presented and necessarily involved in determining the case, and the decision on those questions become the law of the case. . . ."

> *Tennessee-Carolina Transp. Inc. v. Strick Corp.*, 286 N.C. 235, 239, 210 S.E.2d 181, 183 (1974); *see also North Carolina Nat. Bank v. Virginia Carolina Builders*, 307 N.C. 563, 299 S.E.2d 629 (1983); *Sloan v. Miller Bldg. Corp.*, 128 N.C. App. 37, 41, 493 S.E.2d 460, 463 (1997); *Weston v. Carolina Medicorp, Inc.*, 113 N.C. App. 415, 417, 438 S.E.2d 751, 753 (1994). Under the

> law of the case doctrine, an appellate court ruling on a
> question governs the resolution of that question both
> in subsequent proceedings in the trial court and on a
> subsequent appeal, provided the same facts and the
> same questions, which were determined in the pre-
> vious appeal, are involved in the second appeal. *See
> Weston v. Carolina Medicorp., Inc.*, 113 N.C. App. at
> 417, 438 S.E.2d at 753.

*Creech*, 147 N.C. App. at 473-74, 556 S.E.2d at 589.

As the majority opinion makes clear, once credits against the appel-
lee's sentence were applied due to the decision in *Bowden II*, the defen-
dant acquired a liberty interest which cannot be rescinded arbitrarily
without running afoul of the Ex Post Facto clause of the United States
Constitution or violating due process. These are well-settled principles
of constitutional law and the majority discusses the case law in more
than sufficient detail. *See Wolff v. McDonnell*, 418 U.S. 539, 555, 41 L. Ed.
2d 935, 950 (1974); and *Greenholtz v. Nebraska Penal Inmates*, 442 U.S.
1, 60 L. Ed. 2d 668 (1979).

At the time that *Bowden II*'s ruling was ready for implementation,
his case became politically controversial and further litigation devel-
oped. The case that went to our Supreme Court, *Jones v. Keller*, 364 N.C.
249, 698 S.E.2d 49 (2010), however, had a completely different factual
scenario. There the Court gave deference to the DOC's interpretation
of their own rules, regulations and the implementation of those rules.
As the majority opinion demonstrates, credits had never been applied
to the inmate involved in that litigation whereas this defendant-appellee
has been awarded credits both before and after litigation. I write sepa-
rately to stress that the applicability of *Jones* is irrelevant due to the law
of the case doctrine set forth above.

*Bowden II* clearly held that life sentences were equivalent to a
sentence of 80 years. This Court came to that conclusion after taking
judicial notice of a statement in the State's brief in the case of *State
v. Richardson*, 295 N.C. 309, 245 S.E.2d 754 (1978). I believe it is worth
reviewing what we said in *Bowden II* on this issue:

> Defendant asks our Court to take judicial notice
> of a statement contained in the State's brief in *State
> v. Richardson*, 295 N.C. 309, 245 S.E.2d 754 (1978), and
> we grant defendant's request. An appellate court may
> take judicial notice of the public records of other courts
> within the state judicial system. *Whitmire v. Cooper*, 153

N.C. App. 730, 735 n.4, 570 S.E.2d 908, 911 n.4 (2002), *disc. review denied, appeal dismissed,* 356 N.C. 696, 579 S.E.2d 104 (2003). Accordingly, we take judicial notice of the following sentence: "The State agrees with the defendant that credit is now provided to those serving a life sentence since N.C.G.S. § 14-2 makes a life sentence equivalent to 80 years." Here, the State concedes to what defendant is currently arguing. Our judicial notice of this sentence is dispositive to the issue of whether defendant's life sentence is equivalent to 80 years for purposes other than parole eligibility.

*Bowden II,* 193 N.C. App. at 600, 668 S.E.2d at 109.

In *Bowden II,* we also noted that our holding was consistent with precedent established by our Supreme Court:

Even without our judicial notice of the statement above, we still hold that N.C. Gen. Stat. § 14-2 (1974) treats defendant's life sentence as an 80-year sentence for all purposes. Our Supreme Court has previously considered a life sentence to be equivalent to 80 years, pursuant to N.C. Gen. Stat. § 14-2 (1974), for purposes other than parole eligibility. *See State v. Williams,* 295 N.C. 655, 679, 249 S.E.2d 709, 725 (1978); *see also Richardson,* 295 N.C. at 318-19, 245 S.E.2d at 760-61. In *Richardson,* our Supreme Court considered the defendant's life sentence to be the equivalent of 80 years for purposes of determining his pretrial incarceration credit. *Id.* In *Williams,* our Supreme Court decided that each of the defendant's life sentences was equal to 80 years for purposes of adding his consecutive sentences and determining his total sentence of 300 years. *Williams,* 295 N.C. at 679-80, 249 S.E.2d at 725.

*Id.* at 600, 668 S.E.2d at 109-10.

Normally, appellate courts do not allow parties to take divergent positions, but in all subsequent litigation on this issue, the State has been allowed to take a position that is completely contrary to the position it took in *Richardson.* While the State's concession was not essential to the disposition of *Bowden II,* as there were 2 cases decided by our Supreme Court that essentially held that life sentences in the timeframe now under review were equivalent to 80-year sentences, it was a frank

recognition by all parties that the statute meant what it said. In *Bowden II* on this point, we stated:

> We do not read this statute to be ambiguous nor do we find that it must be read in conjunction with N.C. Gen. Stat. § 148-58 (1974). The plain language of the statute states that life imprisonment shall be considered as a sentence of imprisonment for a term of 80 years in the State's prison without any limitation or restriction. We are not permitted to interpolate or superimpose provisions or limitations which are not contained in the text of the statute. *Sonopress, Inc. v. Town of Weaverville*, 139 N.C. App. 378, 383, 533 S.E.2d 537, 539 (2000). Had our Legislature intended that N.C. Gen. Stat. § 14-2 (1974) only apply when determining a prisoner's parole eligibility, it would have been a simple matter to have included that explicit phrase. *See In re Appeal of Bass Income Fund*, 115 N.C. App. 703, 706, 446 S.E.2d 594, 596 (1994).

*Bowden II*, 193 N.C. App. at 601, 668 S.E.2d at 110.

It seems disingenuous for the State to argue otherwise now, after the decision became controversial. The rule of law cannot survive if parties are allowed to abandon positions taken in court merely because they are displeased with the result or their concession leads to a decision that later becomes controversial. I doubt that the citizens of North Carolina are placed at risk if a small number of geriatric prisoners are released after having served over 38 years in prison. Yet, the State has repudiated its own interpretation of the law to be able to make the arguments it has made in both *Bowden II* and this case, *Bowden III*, as well as the arguments made in *Jones v. Keller*. I believe that allowing a party to shift its argument due to controversy is a far greater danger to our State.

In all other respects, I fully concur in the majority opinion.